Chris Wayne SHUFFIELD, Appellant,

v.

The STATE of Texas.

No. AP–74574.

Court of Criminal Appeals of Texas.

Feb. 15, 2006.

Rehearing Denied May 3, 2006.

784

Troy Hornsby, Texarkana, for Appellant.

Alwin A. Smith, Asst. District Atty., Texarkana, Matthew Paul, State's Atty., Austin, for State.

## OPINION

PRICE, J., delivered the opinion of the Court, in which MEYERS, WOMACK, JOHNSON, HOLCOMB, and COCHRAN, JJ., joined.

In February 2003, a jury convicted the appellant of a capital murder.[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced the appellant to death.[2] Direct appeal to this Court is automatic.[3] The appellant raises seven points of error. We shall affirm.

### I. Facts

The State indicted the appellant for causing the death of Lance Walker while in the course of committing or attempting to commit the offense of robbery. The appellant and his brother Billy went over to Walker's house, where they drank beer, smoked marijuana, and played darts. At some point, the appellant picked up a shotgun and shot Walker. With his brother's

---

**1.** TEX. PENAL CODE § 19.03(a).

**2.** TEX.CODE CRIM. PROC. Art. 37.071, § 2(g).

**3.** TEX.CODE CRIM. PROC. Art. 37.071, § 2(h).

help, the appellant then took some items from the house, including money, guns, and Walker's truck. In a statement he later gave to police, the appellant admitted that he had told Billy on the way to Walker's house that he had been thinking about "sticking someone up and taking their vehicle." The appellant told police that he had planned to kill the person for the vehicle and that Billy agreed to help.

## II. Jury Selection

In his fourth and fifth points of error, the appellant asserts that the trial court erred in ruling that he failed to make a *prima facie* showing that the State had exercised its peremptory strikes with a discriminatory purpose against four venire members.[4] After an initial review of the claim, we abated this appeal for a hearing regarding the State's use of its peremptory strikes against venire members Seymour, Drake, Nelson, and Talton.[5]

A *Batson* challenge generally gives rise to a three-step process. First, the defendant must make a *prima facie* case that a venire member was peremptorily excluded on the basis of race.[6] Next, the prosecution must come forward with race-neutral reasons for the peremptory strike.[7] Finally, the defendant has the opportunity to rebut the State's explanations.[8] The burden of persuasion remains with the defendant to prove purposeful discrimination.[9] In *Purkett v. Elem*, the United States Supreme Court explained that "unless a discriminatory intent is inherent in the prosecutor's explanation, the

reason offered will be deemed race neutral." [10]

At the hearing, the lead trial prosecutor explained why the State had struck each of the four complained-of venire members. The second prosecutor echoed the lead prosecutor's reasons and added some of her own recollections. Specifically, the prosecutors gave the following reasons for striking the venire members:

*Seymour*—was young, had a prior conviction for driving while intoxicated (DWI) and a prior conviction for possessing marijuana, felt he had been mistreated during the DWI because his license was suspended, held a grudge against one of the officers involved in the DWI because he felt the officer did not treat him right, was single, had no children, and vacillated regarding his personal feelings regarding the death penalty. The prosecutor explained that he had a practice of not allowing persons with convictions to sit on his juries, and the State was looking for parents because the victim was an adult child with "special problems" who was living alone. Co-counsel added that she was not sure that he was being completely honest about his criminal background.

*Drake*—did not believe in the death penalty but could assess it in the proper case, could not think of anything he thought was mitigating except possibly drug and alcohol abuse, appeared predisposed towards a life sentence if he thought the victim had any responsibili-

4. Tex.Code Crim. Proc. Art. 35.261; *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

5. *Shuffield v. State*, No. AP–74,574, 2005 WL 1009562 (Tex.Crim.App. Apr. 27, 2005) (not designated for publication).

6. *Simpson v. State*, 119 S.W.3d 262, 268 (Tex. Crim.App.2003).

7. *Ibid.*

8. *Ibid.*

9. *Ibid.;* see also *Johnson v. State*, 68 S.W.3d 644, 649 (Tex.Crim.App.2002).

10. 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *see also Simpson*, 119 S.W.3d at 268.

ty in the altercation. The prosecutor explained that he thought part of the defense theory was that the appellant was a drug addict who was high at the time of the offense. Co-counsel remembered that Drake talked about needing to find premeditation before he could find someone guilty of capital murder.

*Nelson*—her son was sent to prison for three years eight days before trial, circled two answers on her questionnaire regarding her beliefs generally opposing the death penalty, worked in the pharmacy of the Telford Unit and knew many of the inmates in the maximum security unit but did not believe that most of them would be future dangers, and constantly commented that she would need proof "beyond a shadow of a doubt" in order to find a person guilty of capital murder. Co-counsel remembered that Nelson had commented that evidence regarding sexual abuse of the defendant would have weighed heavily in mitigation, and co-counsel was certain that the appellant intended to raise such evidence.

*Talton*—generally stated that he did not believe in and would not assess the death penalty, but equivocated and vacillated enough to defeat a challenge for cause.

▇ None of the prosecutors' explanations reflect an inherently discriminatory intent. The appellant attempted to rebut the State's reasons with statistical calculations and a comparison with other jurors. In his comparative analyses, the appellant discussed the allegedly disparate treatment of venire members who shared only one isolated issue or view in common with a struck venire member. The appellant did not raise or discuss any disparate

treatment of any venire member who shared a combination of reasons. The trial court found that the State's explanations were race neutral and not pretexts for racial strikes. The trial court's findings are supported by the record and are not clearly erroneous. Points of error four and five are overruled.

▇ In his sixth point of error, the appellant claims that the trial court erred in releasing members based upon unsworn excuses. He asserts that Texas Government Code Section 62.110 allows a trial court to release venire members based upon a reasonable sworn excuse. In his brief, the appellant complains only about the excusing of venire member McElroy. Because the record shows that the appellant expressly stated that he had no objection to the court's excusing McElroy, he has waived any error on this point.[11] Point of error six is overruled.

## II. Evidentiary Issues

In his first point of error, the appellant claims that the trial court erred in admitting gruesome, close-up photographs of the victim's corpse because the photographs were "irrelevant and unfairly prejudicial in light of the defense's decision not to refute the victim's cause of death."[12] The appellant asserts that the photographs were rendered unnecessary because the issue of the cause of the victim's death was presented by other evidence and was not in dispute. The appellant specifically complains about State's Exhibits 19–22, 24–25, 27–29, and 66–68.

▇ The admissibility of a photograph is within the sound discretion of the trial judge.[13] Texas Rule of Evidence 401 de-

---

**11.** *Mays v. State,* 726 S.W.2d 937, 950 (Tex. Crim.App.1986); *see also* Tex.R.App. P. 33.1.

**12.** Tex R. Evid. 401–403.

**13.** *Williams v. State,* 958 S.W.2d 186, 195 (Tex.Crim.App.1997).

fines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The photographs showed the location of the body at the crime scene and the wounds that caused the victim's death. Therefore, the photographs were relevant during the guilt phase of the trial. The fact that the jury had also heard testimony regarding the injuries depicted does not necessarily reduce the relevance of the visual depiction.

■ Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial.[14] We have said that a Rule 403 analysis should include, but is not limited to, the following factors:

> (1) how probative the evidence is;
> (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way;
> (3) the time the proponent needs to develop the evidence; and
> (4) the proponent's need for the evidence.[15]

■ The reviewing court should, using an abuse of discretion standard, "do more than decide whether the trial judge did in fact conduct the required balancing between probative and prejudicial values;

'the trial court's determination must be reasonable in view of all relevant facts.' "[16]

■ In the context of the trial court's admitting a photograph, we should consider: the number of photographs, the size of the photograph, whether it is in color or black and white, the detail shown in the photograph, whether the photograph is gruesome, whether the body is naked or clothed, and whether the body has been altered since the crime in some way that might enhance the gruesomeness of the photograph to the appellant's detriment.[17]

■ State's Exhibits 19–22, 24–25, and 27–29 were identified by Bill Eubanks, the crime-scene detective who had taken the photographs. Eubanks testified that the photographs accurately depicted the scene of the crime as he found it. The photos in the record are three-and-one-half inches by five inches and black and white. We will assume, however, that these photos were shown to the jury in color.

State's exhibits 19 and 21 show a fairly broad view of the room with Walker's fully clothed body laying behind the sofa where it was found. State's exhibits 20, 22, 24 and 25 are taken from different angles and show a closer view of the body and wounds. None of these photographs are especially detailed, and they are no more gruesome than the crime scene itself as it was found by the police.

State's Exhibits 27–29 are more gruesome than the other photographs in that they show close-up shots of the damage that the shotgun blast did to the victim's head and face. However, these photographs show only the injuries that the

14. *Williams*, 958 S.W.2d at 196.

15. *Montgomery v. State*, 810 S.W.2d 372, 389–90 (Tex.Crim.App.1991) (Op. on Reh'g).

16. *Santellan v. State*, 939 S.W.2d 155 169 (Tex.Crim.App.1997) (quoting the plurality

opinion in *Rachal v. State*, 917 S.W.2d 799, 808 (Tex.Crim.App.1996), and citing *Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim.App.1990)).

17. *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim.App.1992).

victim received and are no more gruesome than would be expected.

■ Finally, State's Exhibits 66–68 appear to be autopsy photographs depicting close-up views of the wounds to Walker's head after the blood has been cleaned off and a short ruler placed near the wound to show the size of the injuries. Except for the ruler, these photographs show only the injuries that the victim received and are no more gruesome than would be expected.

The photographs in question were probative of the crime scene and the injuries received by the victim, were necessary for the State in developing its case, and, because they were not overly gruesome, the photographs did not pose the potential of impressing the jury in some irrational way. The trial court did not abuse its discretion in admitting these photographs, as the danger of unfair prejudice did not substantially outweigh the probative value of the photographs. Point of error one is overruled.

■ The appellant complains in his second and third points of error that a police officer's testimony that the appellant's brother Billy's statement was consistent with the appellant's own statement amounted to inadmissible hearsay and violated his confrontation rights under the United States and Texas Constitutions. Because the appellant provides argument and authority under only the United States Constitution, he has forfeited consideration of these points of error under the Texas Constitution.[18] To consider the appellant's remaining claims, we must examine the questioned testimony and its context.

After opening statements, the State called Sheriff James Prince to testify. Prince testified about his response to the 911 call to this offense and the circum-stances of the appellant's arrest. Prince told the jury that, after the appellant was forcefully removed from his house, an officer read him his *Miranda* warnings,[19] and he was taken to the hospital to receive attention for minor injuries he suffered in the altercation. Prince testified that, later that evening, the police again read the appellant his rights, after which the appellant waived his rights and gave a written statement. Without discussing the contents of the appellant's statement, the prosecutor passed the witness.

On cross-examination, the appellant questioned Prince about the taking of the appellant's confession. Prince conceded that the appellant had made some comments that were not included in his written confession. The appellant then asked Prince whether there were any "statements made to you that were inconsistent with what is in that [written] statement?" Prince replied that there were not. Apparently attempting to impeach Prince's credibility, the appellant then offered a statement made by another witness in which the witness stated that he observed the appellant making a statement to Prince that was inconsistent with the statement the appellant ultimately signed. The trial court sustained the State's objection that the offer was "a back-door attempt to try [to] get in self-serving hearsay."

The appellant next asked Prince whether, in his experience, suspects had ever lied to him, and he explored with Prince various reasons why a suspect might lie. The questions the appellant asked implied that, while there was no dispute that the appellant killed Walker, the statement that he killed him to get his truck was actually fabricated by the officers questioning him to raise the offense from murder to capital murder. In fact, throughout the cross-

---

**18.** *Heitman v. State,* 815 S.W.2d 681, 690 (Tex.Crim.App.1991).

**19.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

examination, the appellant attempted to develop his defensive theory that the murder was the result of an altercation and not for the purpose of facilitating a theft as suggested by Prince, making the appellant guilty of murder only and not capital murder. The appellant continued his attempt to develop this defensive theory during further cross-examination:

[DEFENSE COUNSEL:] Did you see any inconsistencies in [the appellant's] statement itself, that just didn't seem to make sense to you?

[PRINCE:] No, sir.

Q: I mean did you ever investigate any further after you got that statement to see if there might have been some other circumstances or inconsistencies with what [the appellant] told you?

A: We talked with his brother [Billy]. We found evidence, and we took a written statement from him, typed statement later.

Q: Did you see any internal inconsistencies—internal inconsistencies in the statement itself? For instance, the statement says that there was a shot to the head that was the first shot. Okay? And the essential statement is that this was done in the course of planning and carrying out an intentional robbery to rob his truck. But then the statement says that when the shot occurred, that [the appellant] ran out and grabbed a rag and tried to stop the bleeding in the head. Don't you find that inconsistent?

A: I don't know what was going through his mind at that particular time.

On re-direct, the prosecutor rebutted the appellant's defensive theory that the murder had not been committed in order to facilitate stealing Walker's truck. Specifically, the following occurred:

[PROSECUTOR:] [The appellant] gave you the statement. He gave you and Captain Pappas a written statement . . .

of what had happened, why it happened, and what was going on.

[PRINCE:] Yes, sir.

Q: And at the time he gave you that statement, you say he was calm, cool and collected?

A: Yes, sir.

Q: Okay. Now you were asked if you went out and investigated anything else. When the defendant gave you that statement, did he give you any information that suggested to you that you needed to go find out some other motive for this murder?

A: No, sir.

Q: When you talked to the defendant, had you already talked to his brother?

A: Yes, sir.

* * *

Q: And when you talked to [the appellant's] brother, you took a written statement from him.

A: One of my investigators did, yes, sir.

Q: And you were present during that?

A: Yes, sir.

Q: And then it was some hours later, almost two hours later if my memory is correct, that you actually took a statement from the defendant.

A: Yes, sir, after we completed with his brother.

Q: Then you and your officers continued your investigation, did you not?

A: Yes, sir.

Q: You found additional property.

A: Yes, sir.

Q: You located additional witnesses and people who may have had information.

A: My investigator did. Yes, sir.

Q: Did you or your investigators find anything inconsistent with what the de-

fendant had told you and Captain Pappas happened to Lance Walker?

A: No, sir.

Q: Did his brother not make a very consistent statement as to what happened to Lance Walker and why?[20]

A: Yes, sir.

[DEFENSE COUNSEL]: Your Honor, we're going to object to this as hearsay.

Q: I believe the defense has opened the door, Judge.

[DEFENSE COUNSEL]: We have had no opportunity to cross-examine this witness. It's purely hearsay, and it's a violation of my client's Constitutional rights to confront witnesses.

THE COURT: Overruled.

Q: And you took his statement before you took the defendant's statement.

A: That's correct, the written statement.

Q: When the defendant gave you his statement, was it consistent with what his brother had told you?

A: Yes, sir.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[21] Hearsay is inadmissible unless expressly authorized by statutes or rules.[22] Because the State did not introduce the substance of Billy's statement, we do not know its precise content. However, Prince's testimony that Billy's statement was consistent with the appellant's statement as to *what* happened and *why* implies its content. Furthermore, the State offered the complained-of comment to rebut the appellant's implication that part of the appellant's statement was fabricated. The comment supported the State's position that the information in the appellant's statement was in fact true. Because of this implication, and because the parties treated the testimony as hearsay, we will assume without deciding that the testimony was hearsay.[23]

In addition to the rules generally prohibiting hearsay, in all criminal prosecutions the accused has a right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, "to be confronted with the witnesses against him."[24] Even when hearsay is properly admitted against a criminal defendant under evidentiary rules, the evidence implicates the Confrontation Clause of the Sixth Amendment because the defendant is not afforded the opportunity to confront the out-of-court declarant.[25] Recognizing that hearsay can be of different character, the United States Supreme Court recently held in *Crawford v. Washington* that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: Confrontation."[26] Although the Supreme Court declined to spell out a comprehensive definition of

---

20. This is the specific statement about which the appellant complains on appeal.

21. Tex.R. Evid. 801(d).

22. Tex.R. Evid. 802.

23. Whether the hearsay was admissible under an exception or not is immaterial given our resolution of the appellant's confrontation point. *See* Tex.R. Evid. 803; Tex.R.App. P. 44.2(b).

24. U.S. Const. Amend. 6; *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (applying Sixth Amendment to the States).

25. *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

26. 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)

what constitutes "testimonial" evidence, it stated that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." [27]

■■■ Having assumed that the complained-of testimony was hearsay, and knowing that the statement referred to was the result of police interrogation, the admission of Billy's actual statement would have violated the appellant's confrontation rights. Billy's statement was not introduced in this case. Nonetheless, Prince's testimony in effect informed the jury of the general substance of Billy's statement and how it related to the appellant's statement such that Billy's statement was used against the appellant without giving him an opportunity to confront the declarant, Billy. Under these circumstances the appellant's confrontation rights were arguably violated. We will now determine whether the appellant was harmed by admission of the statement. Under Rule of Appellate Procedure 44.2(a), we must reverse the conviction unless we determine beyond a reasonable doubt that the error did not contribute to the jury's verdict. [28]

The appellant claims that Prince's testimony harmed him because the central issue to the case, if not the sole issue, was whether the appellant had formed the intent to steal Walker's truck before he shot him. The appellant asserts that without the reference to Billy's statement, he was able to discredit Prince's testimony and undercut the statement in the appellant's own confession that he murdered Walker to steal his truck. We disagree with the appellant's assertion.

As seen in the above-quoted testimony, Prince testified that, after talking to Billy and the appellant, the authorities continued their investigation into the offense and "found additional property" and "located additional witnesses and people who may have had information." Although Prince gave no specific details about the "additional property and witnesses," he testified that none of this information was inconsistent with what the appellant had told him. Furthermore, the appellant stated in his confession that he stole the guns with which he shot Walker and took money out of Walker's pockets. A lighter and medicine bottles with the victim's name on them were also found in the appellant's possession.

■■■ The appellant was indicted for committing capital murder by intentionally killing Walker while in the course of committing or attempting to commit robbery. Evidence is sufficient to support a capital murder conviction if it shows an intent to obtain or maintain control of property which was formed before *or contemporaneously with* the murder. [29] The only fact that the appellant attacks as fabricated is that he murdered Walker to steal his truck. However, the appellant was not indicted for stealing or attempting to steal a particular item from Walker. Further, the law does not require the State to allege the theft of a particular item, only to prove at trial that *something* was stolen, and that the intent to take it was formed before or contemporaneously with the murder. To prove its case of capital murder, the State was not required to prove that the appellant formed the intent to steal Walker's truck, or even that he took it at all.

The appellant admitted in his statement that he took money and guns from Walker during the crime. Further, he does not attack these admissions or the fact that other property belonging to the victim was

**27.** *Ibid.*

**28.** Tex.R.App. P. 44.2(a).

**29.** *Garrett v. State,* 851 S.W.2d 853, 856 (Tex. Crim.App.1993).

found in his possession. Because the theft of the truck was not necessary to prove capital murder, and because the jury could have inferred from this evidence that the appellant did form the intent to steal either before or contemporaneously with the murder, the appellant's conviction for capital murder is supported regardless of the lack of any pre-formed intent to steal Walker's truck. Thus, we hold that the admission of the testimony did not materially affect the jury's deliberations and was harmless beyond a reasonable doubt.[30] Points of error two and three are overruled.[31]

In his seventh point of error, the appellant asserts that the trial court erred in excluding testimony in mitigation of punishment "regarding a history of family sexual abuse of multiple generations of children in [the appellant's] family." Specifically, the appellant claims that he was improperly prohibited from presenting testimony from his brother, Clifton Heath Shuffield; his uncle, Robert "Bobby" Shuffield; and his uncle's wife, Christine Shuffield. A summary of the testimony offered is necessary to resolve this point.

Clifton testified that he spent time with his uncle, Danny Shuffield, and at times they would smoke marijuana. When asked what else Clifton did with Danny, the State objected that such testimony was not relevant to the defendant in this case. Outside the presence of the jury, Clifton testified that Danny sexually abused him on a number of occasions, that Danny called Clifton before the appellant's trial began and told him not to testify about the molestation, that the appellant asked Clifton if he had been molested, and that the appellant told him that Danny had also

molested him. The trial court sustained the State's objection and excluded the testimony.

After the ruling, the appellant commented that he had another witness that he intended to call who would talk about the history of sexual abuse within the family. Still outside the jury's presence, the appellant then called his uncle, Robert, to the stand. Robert testified that he had three brothers, Danny; Billy, Sr., who was the appellant's father; and Jimmy. Robert testified that he and Billy were repeatedly molested by an "Uncle Burl," but he could not say whether Danny was ever molested. The State objected that the testimony was irrelevant and highly prejudicial. The court sustained the objection and excluded the testimony.

At the end of the day's testimony and after the court retired the jury for the evening, the appellant called Christine to the stand. Christine testified that she was married to Robert, that Robert told her that Danny had stated that the children would occasionally fondle him in his sleep, and that Robert threatened her if she testified in the appellant's trial. The appellant noted that he was offering this testimony only for the purpose of impeaching Robert's testimony that he had not had any such conversation with Christine. The trial court took the matter under advisement.

The next morning, the appellant urged the court to reconsider its ruling excluding the testimony of instances of sexual abuse in the appellant's family, "and also statements made by the defendant himself that he was abused by his Uncle Danny as a child." The State noted that it had no

---

**30.** Tex.R.App. P. 44.2(a).

**31.** Because we conclude that the admission of Billy's statement was harmless beyond a reasonable doubt under the stricter constitution-

al standard in Rule of Appellate Procedure 44.2(a), we need not address whether the trial court erred in admitting the statement over the appellant's hearsay objection.

objection to testimony concerning the appellant's statements that he had been sexually abused. In fact, it pointed out testimony from other witnesses during which that very fact was admitted into evidence. However, the State did continue to object to any testimony about sexual abuse not suffered by the appellant himself. The trial court again sustained the objection and reiterated that testimony involving the sexual abuse of others was excluded. The trial court further ruled that the testimony from Christine that was offered for impeachment would also be excluded because it was simply a back door attempt to get the same inadmissible testimony into evidence.

▪ An appellate court reviews a trial court's decision to admit or exclude evidence under an abuse of discretion standard.[32] If the trial court's decision was within the bounds of reasonable disagreement, the appellate court should not disturb its ruling.[33]

▪ Texas Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Furthermore, except as otherwise provided by statute or rule, a jury is entitled to have before it "all possible relevant information about the individual defendant whose fate it must determine." [34] Even when the evidence is relevant, the trial court may be within its discretion to exclude it pursuant Texas Rule of Evidence

403. Under Rule 403, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

▪ The fact that others in the appellant's family were abused does not by itself make the appellant more or less morally culpable for the crime for which he was on trial. Nor does it, by itself, make a jury's finding of, mitigation any more or less probable than it would be without the evidence.[35] Evidence that the appellant himself was sexually abused is relevant and probative when a jury is considering evidence in mitigation of the death penalty. However, the State made clear that, not only did it not object to this type of evidence, the substance of the relevant evidence came in through other witnesses. Looking at the entirety of the record, we cannot say that the trial court abused its discretion in excluding the complained-of testimony. Point of error seven is overruled.

We affirm the judgment of the trial court.

KELLER, P.J. concurred in the result.

HERVEY, J., filed a concurring opinion, in which MEYERS and KEASLER, JJ., joined.

---

**32.** *Rachal v. State,* 917 S.W.2d 799, 816 (Tex. Crim.App.1996).

**33.** *Ibid.*

**34.** *Sells v. State,* 121 S.W.3d 748, 766 (Tex. Crim.App.2003).

**35.** *See Tennard v. Dretke,* 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004) (holding

that the meaning of relevance in the context of mitigating evidence introduced in a capital sentencing proceeding is no different than in any other context, and thus the general evidentiary standard of "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" applies).

HERVEY, J., concurring in which MEYERS and KEASLER, JJ., joined

As I understand it, appellant's defense at trial was that he was not guilty of capital murder but was guilty only of murder, claiming he murdered the victim during an altercation and took his truck and other property merely as an after-thought. To this end, appellant, through his cross-examination of Sheriff's deputy Prince, sought to establish that Prince fabricated a portion of appellant's written statement to Prince where appellant claimed to have told his brother Billy that he planned to murder the victim for his vehicle. The prosecution rebutted this defensive theory on re-direct examination of Prince with Prince's testimony that brother Billy gave the police an unfabricated statement that was "very consistent" with appellant's statement to Prince. This evidence, therefore, apparently was offered, not for the hearsay purpose of supporting the truth of the matter asserted in brother Billy's statement, but for the nonhearsay purpose of proving that Prince did not fabricate the critical portion of appellant's statement that he planned to murder the victim for his vehicle.[1]

In its disposition of points of error two and three, the Court assumes that Prince's testimony was offered for the hearsay purpose of supporting the truth of the matter asserted in brother Billy's statement, and then decides that the admission of this testimony violated appellant's confrontation rights under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Court nevertheless decides that any error was harmless beyond

a reasonable doubt essentially because appellant stole other items besides the victim's truck.

This, however, has little, if anything, to do with whether the admission of brother Billy's statement for its hearsay purpose was harmless beyond a reasonable doubt given appellant's defense in this case. Appellant never disputed that he stole the victim's property. His defense was that he did not form the intent to steal any of the victim's property until after he murdered the victim. This being appellant's defense, that portion of his statement to the police where he claimed to have planned to murder the victim for his vehicle took on added significance to the prosecution's case that appellant murdered the victim as part of a robbery. A jury could have considered the substance of brother Billy's statement to have been critical evidence to prove this if the jury doubted whether appellant formed the intent to steal the victim's property after the murder and whether Prince fabricated critical portions of appellant's statement. Any error in admitting brother Billy's statement for its truth may have been harmless beyond a reasonable doubt, but not because appellant stole other items besides the victim's truck.

I would dispose of points of error two and three by deciding that the admission of Prince's testimony did not violate appellant's Sixth Amendment Confrontation Clause rights since the record supports a finding that brother Billy's statement was not offered for its truth but for the nonhearsay purpose of rebutting appellant's

---

1. Based on the portions of the record set out in the Court's opinion, it could be argued that the prosecution offered brother Billy's statement for its truth (inadmissible purpose) and not to rebut appellant's defensive theory that Prince fabricated portions of appellant's statement (admissible purpose). This, however, is of no consequence since appellant did not request the trial court to limit the evidence to its proper purpose. *See* Tex R. Evid. 105(a) (court's admission without limitation of evidence admissible for one purpose but inadmissible for another purpose is not ground for complaint on appeal in absence of request that evidence be limited to its proper scope).

defensive theory that Prince fabricated critical portions of appellant's statement. *See Crawford,* 541 U.S. at 59 n. 9, 124 S.Ct. 1354 (Confrontation Clause does not bar use of testimonial statements for purposes other than establishing the truth of the matter asserted) *citing Tennessee v. Street,* 471 U.S. 409, 411, 417, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985) (defendant's Sixth Amendment Confrontation Clause rights not violated by admission of accomplice's confession for nonhearsay purpose of rebutting defendant's testimony that his own confession was coercively derived from the accomplice's confession). The substantive Confrontation Clause claim presented in points of error two and three is controlled by *Street* which was cited with approval in *Crawford,* 541 U.S. at 59 n. 9, 124 S.Ct. 1354.

With these comments, I concur in the Court's judgment.

